RECEIVED
IN LAKE CHARLES, LA

MAY 15 2014

TONY R. MOORE, CLERK
BY_____
            DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| CAROL J. VINCENT | * | CIVIL ACTION NO. 2:13-CV-189 |
| | * | |
| **Plaintiff** | * | |
| | * | |
| V. | * | JUDGE MINALDI |
| | * | |
| CITY OF SULPHUR, ET AL. | * | |
| | * | |
| **Defendants** | * | MAGISTRATE JUDGE KAY |

**************************************************************************

## MEMORANDUM RULING

Before the court is the Motion for Summary Judgment Based on Qualified Immunity [Doc. 23], filed by the City of Sulphur, Lewis Coats, Chief of Police for the City of Sulphur, Officer Chester Gremillion and Officer Glenn Martin (defendants), to which the *pro se*[1] plaintiff has filed an Opposition [Doc. 25], and the defendants have filed a Reply [Doc. 26].  For the following reasons, the Motion [Doc. 23] is hereby **GRANTED IN PART**, **DENIED IN PART**, and **STAYED IN PART**.

## FACTS & PROCEDURAL HISTORY

On August 6, 2012, the plaintiff alleges that he went to the C.S.E. Credit Union on Swisco Road, in Sulphur, Louisiana, for the purpose of discussing a discrepancy regarding a federal tax lien on behalf of a friend, Mr. Victor Chaisson, who was at the time out of the country.[2]  The plaintiff met with Ms. Amanda Vaussine (Vaussine), a Credit Union employee,[3] who instructed the plaintiff that he needed a tax lien release from the Clerk of Court.[4]

---

[1] The Fifth Circuit has stated that the briefs of *pro se* litigants are entitled both to a liberal construction and the application of less stringent standards in interpreting such litigants' arguments as opposed to briefs of those litigants represented by counsel. *Harris v. Barnhart*, 204 Fed. Appx. 447, 448 (5th Cir. 2006) (*citing Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995)).  *See also Taylor v. Comm'r*, 350 Fed. Appx. 913, 915 (5th Cir. 2009) (*citing Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

[2] Pet. [Doc. 1-2], at 2.

On August 7, 2012, the plaintiff again met with Vaussine.[5]  Vaussine was apparently unable to assist the plaintiff at the time, and the plaintiff left his email address with Vaussine for her to follow up with him.[6]  Upon returning home, the plaintiff alleges that he was phoned by Deputy Taylor of the Calcasieu Parish Sheriff's Office (CPSO), who informed the plaintiff that he could not return to the Credit Union, as he was not a Credit Union member.[7]

On August 8, 2012, the plaintiff was phoned by Detective Breaux at the CPSO who asked the plaintiff to come down to the sheriff's substation.[8]  Once the plaintiff arrived at the substation, Detective Breaux asked the plaintiff if he had stated to Vaussine that he was going to get a gun and kill Mayor Christopher Duncan and city councilman Mike Koonce.[9]  The plaintiff denied making such a statement.[10]

On August 9, 2012, Officer Chester Gremillion pulled the plaintiff over near Frasch Elementary School, on South Huntington Street, in Sulphur, Louisiana.[11]  Officer Gremillion informed the plaintiff that he was not being stopped for a traffic violation; rather, the stop was for the sole purpose of informing the plaintiff of a "no trespass order" against him, as well as to inform the plaintiff that he was henceforth forbidden to set foot upon all public property in the City of Sulphur.[12]  The plaintiff was not provided with a copy of the order.[13]  The no trespass

---

[3] The plaintiff notes in his state court Petition that there was some prior history of a dispute between the plaintiff and Ms. Vaussine involving an allegation that the plaintiff had previously threatened her in an attempt to coerce her into placing a campaign sign for Christopher Duncan in her yard. *See* Pet. [Doc. 1-2], at 2.
[4] *Id.* at 2-3.
[5] *Id.* at 3.
[6] *Id.* at 4.
[7] *Id.*
[8] *Id.*
[9] Pet. [Doc. 1-2], at 5.
[10] *Id.*
[11] *Id.*
[12] *Id.*  This was to include "city hall, city council meetings, city council chambers, [the] police department, West Calcasieu Business Center at the old City of Sulphur City Hall, [and] the courthouse." *Id.*
[13] *Id.*

order, which appears to have been the unilateral decision of certain law enforcement officers, was at no time reviewed by any member of the judiciary.

The Official Notification of Trespass Warning [Doc. 23-4], which bears the signature of the plaintiff, states that the signee "understand[s] that if [he] return[s] to this property for any reason [he] will be subject to arrest under Louisiana RS 14:63.3."[14]  The property in question is described as "All city of Sulphur owned property," and the document lists the warning as emanating from "Sgt. C. Gremillon, an officer of the Sulphur Police Department."[15]

On September 5, 2012, Sulphur Police Chief Lewis Coats received the first of several letters in this matter from the plaintiff inquiring as to why the no trespass order was issued.[16]  Chief Coats phoned the plaintiff and left a voicemail, which was not returned.[17]  Presumably wishing to preserve a record of communications, the plaintiff requested that Chief Coats respond in writing, which he did on October 4, 2012, wherein Chief Coats stated that the no trespass warning was issued "in an attempt to prevent [the plaintiff] from entering any city owned property where [he] could have come in contact" with those he allegedly threatened.[18]  The plaintiff responded via a letter dated October 11, 2012, requesting a meeting at a "neutral" location, so as not to subject himself to arrest for entering the city-owned police station in violation of the no trespass order.[19]

"Around the same time," Chief Coats was advised by the District Attorney that there was "insufficient evidence to pursue any charges against [the plaintiff]."[20]  On October 16, 2012,

---

[14] Official Notification of Trespass Warning [Doc. 23-4], at 1.
[15] *Id.*
[16] Letter from Carol J. Vincent to Lewis Coats, Sulphur Police Chief, Sept. 4, 2012 [Doc. 23-4], at 2.
[17] Aff. of Lewis Coats [Doc. 23-3], at ¶ 5-6.
[18] Letter from Carol J. Vincent to Lewis Coats, Sulphur Police Chief, Sept. 27, 2012 [Doc. 23-4], at 3; Letter from Lewis Coats, Sulphur Police Chief, to Carol J. Vincent, Oct. 4, 2012 [Doc. 23-4], at 4.
[19] Letter from Carol J. Vincent to Lewis Coats, Sulphur Police Chief, Oct. 11, 2012 [Doc. 23-4], at 5.
[20] Aff. of Lewis Coats [Doc. 23-3], at ¶ 13.

Chief Coats, after discussing the matter with Mayor Duncan,[21] sent a letter to the plaintiff, the letter itself serving as "formal notice that the Trespass Warning given to [him] on August 9, 2012 by Sgt. Chester Gremillion of the Sulphur Police Department [had] been officially terminated effective immediately."[22]

The plaintiff filed suit against the defendants in the Fourteenth Judicial District Court for the Parish of Calcasieu on December 10, 2012, under 42 U.S.C. § 1983, initially seeking compensatory and exemplary damages for alleged violations of the plaintiff's rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution.[23]  On January 24, 2013, the defendants removed the case to federal court pursuant to the court's federal question subject matter jurisdiction.[24]  On September 10, 2013, the defendants filed the Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] that is presently before the court.

## LAW & ANALYSIS

A grant of summary judgment is appropriate when the movant has shown that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. PRO. 56(a).  The moving party bears the initial burden of showing that there is no genuine issue of material fact, and must support its motion by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the movant sufficiently demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." *Gen. Universal*

---

[21] *Id.* at ¶ 14.
[22] *See* Letter from Lewis Coats to C.J. Vincent, Oct. 16, 2012 [Doc. 1-2], at 11.
[23] *See generally* Pet. [Doc. 1-2].
[24] *See* Not. of Removal [Doc. 1], at 1.

*Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (citation omitted).  Where material facts are

in dispute, "the Court must view the facts and draw reasonable inferences in the light most

favorable to the plaintiff." *Priority Staffing, Inc. v. Regions Bank*, No. 5:11-0667, 2013 WL

5462239, at *2 (W.D. La. Sept. 30, 2013) (citation omitted).  However, where "critical evidence

is so weak or tenuous as to an essential fact that it could not support a judgment in favor of the

nonmovant, then summary judgment should be granted. *Webb v. Arbuckle*, No. 09-615, 2011

U.S. Dist. LEXIS 28259, at *7 (W.D. La. Mar. 18, 2011) (*citing Boudreaux v. Swift Transp. Co.*,

402 F.3d 536, 540 (5th Cir. 2005)).

      42 U.S.C. § 1983 "provides a cause of action against an individual who, acting under

color of state law, has deprived a person of a federally protected statutory or constitutional

right." *Whittington v. Maxwell*, 455 Fed. Appx. 450, 455-56 (5th Cir. 2011) (*citing* 42 U.S.C. §

1983). "[Q]ualified immunity—which shields Government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights,' is both a defense to liability and a limited 'entitlement not to stand trial or face the other

burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (internal citations omitted).

"Qualified immunity serves to ensure government employees are not impeded from their public

work to defend frivolous actions." *Porter v. Valdez*, 424 Fed. Appx. 382, 386 (5th Cir. 2011)

(*citing Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)).

      "When an officer argues that he is entitled to qualified immunity from suit, [the court]

first view[s] the evidence 'in the light most favorable to the party asserting the injury' and

decide[s] if 'the facts alleged show the officer's conduct violated a constitutional right.'" *Mesa

v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

In order to overcome a claim of qualified immunity, a plaintiff must plead facts showing "(1)

that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The district court, in its discretion, may consider either of the two prongs first. *Id.* (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The actions of a law enforcement officer violate clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 2083 (*citing Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While a case directly on point is not necessarily required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations omitted).

The plaintiff has asserted a violation of the following constitutionally protected rights: due process under the Fifth and Fourteenth Amendments, freedom of speech, freedom of association, right to petition the government for the redress of grievances, equal protection, the right against unlawful search and seizure, and the right to travel.[25] He has also asserted a claim against the City of Sulphur in connection with the aforementioned claims.[26]

### LA. REV. STAT. ANN. § 14:63.3

Although there is little discussion in the parties' briefs as to the statutory authority for the no trespass warning, it should be noted that the written warning issued to the plaintiff relied on the authority of Louisiana Revised Statute § 14:63.3, which provides in pertinent part that

> No person shall without authority go into or upon or remain in or upon or attempt to go into or upon or remain in or upon any structure, watercraft, or any other movable, or immovable property, which belongs to another, including public buildings and structures, ferries, and bridges, or any part, portion, or area thereof,

---

[25] Pet. [Doc. 1-2], at 7. *See also* Am. Compl. [Doc. 18], at ¶ 5.
[26] Pet. [Doc. 1-2], at ¶ 9.

6

after having been forbidden to do so, either orally or in writing, including by means of any sign hereinafter described, by any owner, lessee, or custodian of the property or by any other authorized person . . . .

LA. REV. STAT. ANN. § 14:63.3 (1978). Louisiana law is "well settled that criminal statutes are strictly construed in favor of the accused and must not be extended by analogy or implication to cover acts not expressly proscribed by such statutes." *Melancon v. Trahan*, 645 So. 2d 722, 726 (La. Ct. App. 1994) (*citing State v. Gonzales*, 241 La. 619 (1961) (additional citations omitted)). Leaving alone for the moment the fact that no argument has been made demonstrating that the officers herein were properly "authorized person[s],"[27] the use of the statute in this case raises serious concerns both with regard to constitutional due process as well as the degree of authority granted, or not granted, to police officers under state law. In *Melancon*, for instance, a Louisiana appellate court found that the same statute did not empower officers to order individuals to leave a public place. *Id.* at 726-27. Additionally, other federal district courts have found violations of procedural due process in circumstances similar to those herein, despite the fact that similar warnings were issued pursuant to a state trespass statute. *See, e.g., Cuellar*, 2013 U.S. LEXIS 43145, at *11-13.

The problem with utilizing Louisiana Revised Statute § 14:63.3 in this manner—to summarily ban an individual from all public property for an indefinite period of time—is that it can too easily be used as a means of oppression or intimidation. As noted by Justice Knoll of the Louisiana Supreme Court, although later amended to "assist sportsmen with leased properties[,]" "[t]his statute was first enacted in 1960 in response to racial 'sit-in demonstrations.'" *State v. Ceaser*, 859 So. 2d 639, 648 (La. 2003) (Knoll, J., dissenting).[28]

---

[27] *See State v. Miller*, 703 So. 2d 125, 127 (La. Ct. App. 1997).
[28] Justice Knoll continues in noting that LA. REV. STAT. ANN. § 14:63.3,
    [f]irst enacted by 1960 La. Acts 78, § 1. . . was a product of a record-breaking output of legislation, including the passage of 35 acts and the proposal of four constitutional amendments, "apparently

7

This statute is typically used to evict disruptive persons from private property—or, occasionally, government buildings—after such persons have been given a reasonable contemporaneous warning and thereafter refused to comply. *See, e.g., State in the Interest of J.A.V.*, 558 So. 2d 214, 215 (La. 1990). *See also State ex rel. of J.D.*, 63 So. 3d 153, 156 (La. Ct. App. 2011); *State v. Caeser*, 859 So. 2d 639, 644 (La. 2003) (applying the statute to find probable cause for arrest wherein the defendant refused to leave a private residence after police were summoned to a domestic disturbance); *State ex rel. E.D.C.*, 903 So. 2d 571, 577-78 (La. Ct. App. 2005) (applying the statute to affirm the juvenile adjudication of a high school student who was told to leave his former campus, refused, and was arrested the same day). In *State in the Interest of J.A.V.*, the Louisiana Supreme Court stopped short of striking down the statute as unconstitutionally vague, but nevertheless granted the juvenile's motion to dismiss where the court found that no "reasonably contemporaneous request to leave" had been made. *J.A.V.*, 558 So. 2d at 215 (*citing* LA. REV. STAT. ANN. § 14:63.3 (1978); *State v. Johnson*, 381 So. 2d 498 (La. 1980)). There, several weeks prior to the juvenile's arrest, he had been banned from a local K-Mart store for suspicion of shoplifting. *Id.* at 215. While there was insufficient evidence to prosecute for the suspected shoplifting, the juvenile was arrested for and charged with violation of Louisiana Revised Statute § 14:63.3 upon his return to the store several weeks later. *Id.* The Louisiana Supreme Court stated that

---

spurred by impending integration of the public schools in Orleans Parish and a rash of so-called 'sit-in' demonstrations." Although "many of these acts do not purport, on their face, to deal with segregation or any other aspect of race relations as such . . . . it seems likely . . . that in operation they [affected] primarily the Negro population of the state." Resulting from the "efforts of the legislature, sitting in special session, to block the implementation of *Brown v. Board of Education*," La. R.S. 14:63.3 "made participation in so-called 'sit-in' demonstrations a very hazardous business."

*Ceaser*, 859 So. 2d. at 648 n.6 (Knoll, J., dissenting). This is not to suggest that the instant case contains any allegations of improper motives based upon race; rather, it is simply to demonstrate the potential for the abuse of such statutes, and to remember the importance of viewing with skepticism any governmental attempt to ban individual citizens from either participation in public discourse or access to public places, offices, and services.

a logical interpretation of the statute "requires a reasonably contemporaneous or written request to leave as an indispensable element of the offense." *State v. Johnson*, 381 So. 2d at 500. A request is "reasonably contemporaneous if given a few hours prior to the arrest, the same day as the arrest or such other pre-arrest interval reasonable under the facts and circumstances of each particular case." *Id.*

*J.A.V.*, 558 So. 2d at 215. The court therein affirmed the juvenile court's granting of the juvenile's motion to dismiss, finding that a warning some weeks earlier did not constitute a reasonably contemporaneous request. *Id.* at 215-16. It is further noteworthy that the property from which the juvenile was banned in *J.A.V.* was private property, and the juvenile therein had no constitutionally protected liberty interest at stake, as the plaintiff here does.

In *Mesa v. Prejean*, 543 F.3d 264 (5th Cir. 2008), one of the two plaintiffs asserted federal claims against several police officers under 42 U.S.C. § 1983, as well as various state law claims—including false arrest, malicious prosecution, battery, false imprisonment, and defamation—after she was arrested for failing to vacate a public street after being ordered to do so by a police officer. *Id.* at 269-71, 273, 275. Dealing specifically with the statute's applicability to public streets and sidewalks, the court noted that state court "precedents at least raise doubt that a sidewalk can be the situs for application of this specific statute." *Id.* at 270. The court ultimately reversed the district court's dismissal of the plaintiff's federal and state claims, finding that there were unresolved issues of fact and that "summary judgment based on qualified immunity should not have been granted." *Id.* at 271-72.

There is also the problem of whether the officers in question possessed sufficient authority under state law to ban the plaintiff from public property. In *State v. Miller*, 703 So. 2d 125 (La. Ct. App. 1997), for instance, the defendant was charged under Louisiana Revised Statute § 14:63 for having refused to leave an Amtrak station after having been ordered to do so by an Amtrak officer. *Id.* at 126. The court noted that, while there may have been an argument

9

to be made as to the applicability of Louisiana Revised Statute § 14:63.3, the statute in question herein, "it [was] not clear whether the officer was possessed of any authority to bar anyone from using the admittedly public facilities." *Id.* at 127. As such, it seems that, under Louisiana law, it is not necessarily a given that a police officer is an "authorized person" under the statute to summarily ban individuals from public property.

PROCEDURAL DUE PROCESS CLAIMS

Regardless of the debatable authority granted to law enforcement officers in this regard under Louisiana Revised Statute § 14:63.3, the defendants will be entitled to qualified immunity unless the plaintiff can show that the defendants committed a constitutional violation of a clearly established right. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. To prevail on a procedural due process claim, a plaintiff must show 1) that he suffered a deprivation of a constitutionally protected interest in "life, liberty, or property," and 2) that such deprivation occurred without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990) (citations omitted). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Id.* at 125 (citation omitted). *See also Morris v. Livingston*, 739 F.3d 740, 749-50 (5th Cir. 2014) (citations omitted).

The principle that an individual possesses a constitutionally protected liberty interest in remaining in a public place of his or her choosing is well-established. For instance, in *Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010), the United States Sixth Circuit Court of

10

Appeals was confronted with a case wherein the plaintiff's chronic habit of "child watching" at a community pool resulted in a pool employee's request to police that they ban the plaintiff from the pool and surrounding areas—all of which was public property. *Kennedy*, 595 F.3d at 330-33. There was ample evidence to support the finding that the plaintiff was indeed "child watching," but the police were unable to show that a crime had been committed and possessed inadequate probable cause for arrest. *Id.* at 332. The Sixth Circuit held that it was "clear that Kennedy had a liberty interest 'to remain in a public place of his choice' and that defendants interfered with this interest." *Kennedy*, 595 F.3d at 336 (*citing City of Chicago v. Morales*, 527 U.S. 41, 54 (1999)).

In *Morales*, the Supreme Court, addressing a vagueness challenge to a Chicago statute that "prohibit[ed] 'criminal street gang members' from 'loitering' with one another or with other persons in any public place," stated that "[i]f the police are able to decide arbitrarily which members of the public they will order to disperse, then the Chicago ordinance becomes indistinguishable from the law [the Court] held invalid in *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965)."[29] *Morales*, 527 U.S. at 45-46, 58-59. In holding that the statute in question violated the Due Process Clause, the Court stated that

> the freedom to loiter for innocent purposes is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment. We have expressly identified this "right to remove from one place to another according to inclination" as "an attribute of personal liberty" protected by the Constitution. *Williams* v. *Fears*, 179 U.S. 270, 274 (1900); *see also Papachristou* v. *Jacksonville*, 405 U.S. 156, 164 (1972). Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage" *Kent* v. *Dulles*, 357 U.S. 116, 126 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 130 (1765).

---

[29] *See Shuttlesworth*, 382 U.S. at 90 (describing the statute in question therein, and stating that, "Literally read . . . this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration.").

*Id.* at 53-54 (some internal citations omitted).  As such, the plaintiff herein certainly may be said to have suffered the deprivation of a constitutionally protected liberty interest.  However, such a deprivation is only actionable under, and in violation of, the Fourteenth Amendment if it occurred without due process of law.

The defendants argue that the plaintiff's interviews with Sheriff's Deputies and police officers constituted sufficient due process.[30]  The Fifth Circuit has stated that, "[a]t a minimum, due process requires that notice and an opportunity to be heard 'be granted at a meaningful time and in a meaningful manner.'" *Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 239 (5th Cir. 2012) (*citing Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).  In determining specifically what process is due in a given situation, courts balance three factors: "(1) the private interest that will be affected by the official's actions, (2) the risk of an erroneous deprivation of that private interest and the probable value, if any, that additional procedural protections would provide, and (3) the interest that the government seeks to achieve." *Sys. Contrs. Corp. v. Orleans Parish Sch. Bd.*, 148 F.3d 571, 575 (5th Cir. 1998) (*citing Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The private interest, already discussed, is one of liberty and a basic freedom to move about on publicly-owned property as any other citizen is legally able to do.  The risk of an erroneous deprivation of that interest would be unacceptably high if police officers were given complete and unilateral discretion to determine which citizens, without criminal charges of any kind being brought, may, for instance, visit public parks, attend governmental meetings, conduct business at the assessor's office or the Office of Motor Vehicles, visit polling stations on election days, or go swimming at the community pool.  This principle has been well-established.  *See generally Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010); *City of Chicago v.*

---

[30] Memo. in Supp. [Doc. 23-1], at 11-12.

*Morales*, 527 U.S. 41, 54 (1999); *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965).  *See also Anthony v. State*, 209 S.W.3d 296 (Tx. Ct. App).[31]

Here, the plaintiff was given no opportunity to have his deprivation reviewed by the judiciary nor was he able to have counsel of his choosing cross-examine his accusers.  *See Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).  He was provided with no neutral or impartial hearing body or officer.  *See Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973).  *See also Cuellar v. Bernard*, No. SA-13-CV-91-XR, 2013 U.S. Dist. LEXIS 43145 (W.D. Tex. Mar. 27, 2013) (finding a procedural due process violation where the police chief and the city attorney summarily issued a no trespass warning to the plaintiff, banning him from city-owned buildings, pursuant to a state statute, following repeated reports of the plaintiff's threatening behavior). While there are certainly instances in which a full evidentiary hearing is not required prior to certain adverse administrative actions, *see, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (citations omitted), the police are not empowered to conduct their own hearings and summarily deprive an individual of a constitutionally-protected liberty interest without the filing of criminal charges for a period of time that is indeterminate at the time the order is issued.

Presuming that the officers were acting in good faith, they were attempting to protect the safety and welfare of those that the plaintiff had allegedly threatened.  While this is certainly an important interest, several lingering questions remain.  For instance, if the officers' goal was the safety of Mayor Duncan and Councilman Koonce, why no one sought a restraining order that would have prevented the plaintiff from going near the alleged targets of his aggression.  It

---

[31] In *Anthony v. State*, 209 S.W.3d 296 (Tx. Ct. App), the court considered "an unwritten policy" in which the City of Henderson, Texas, "delegate[ed] to its police officers the authority to ban persons from public parks at the officers' discretion." *Anthony*, 209 S.W.3d at 301.  In finding that the policy "clearly violate[d] procedural due process and [was] unconstitutionally vague," the court noted, most appropriately, that "due process ordinarily includes the right to confront witnesses." *Id.* at 307 (*citing Wolff v. McDonnell*, 418 U.S. 539, 559 (1974) (additional citation omitted)).

seems odd that the plaintiff would instead be banned from all public property, which seems less effective at achieving public safety and appears more punitive in nature.

Secondly, if the officers' possessed a genuine belief that the plaintiff presented an imminent danger, it is unclear why he was not arrested.  Louisiana law provides that "[w]hoever commits the crime of public intimidation or retaliation against an elected official shall be fined not more than one thousand dollars or imprisoned, with or without hard labor, for not more than five years, or both." LA. REV. STAT. ANN. § 14:122(C) (2003).  Louisiana has also specifically criminalized the threatening of a public official. *See* LA. REV. STAT. ANN. § 14:122.2 (1984). Perhaps the officers thought that the plaintiff was mentally unbalanced, in which case Louisiana law provides for judicial commitment where a court finds that an individual "is either dangerous to himself or dangerous to others." LA. REV. STAT. ANN. § 28:454.6 (2005).  Further, it is troubling both that there are allegations herein that suggest a prior relationship existed between the plaintiff and the alleged targets of his threat—Mayor Duncan and Councilman Koonce—and the fact that it was not until the Mayor gave his consent that the no trespass order was lifted.[32]

The officers had a battery of constitutionally permissible options available to them in the event that they deemed that the plaintiff was a threat.  Instead, they unilaterally made the decision as to where the plaintiff could, and could not, venture on his own. The court is certainly sympathetic to, and has great respect for, the difficulties and complexities faced by law enforcement officers in an increasingly legally complex environment.  However, the practice of providing police officers with complete and total discretion to ban citizens who have been convicted of no crime from accessing public property for an indeterminate period of time would produce far too great a risk of an erroneous deprivation of a citizen's liberty interest.  The

---

[32] Aff. of Lewis Coats [Doc. 23-3], at ¶ 14.

14

plaintiff's constitutional rights were violated.  Thus, the second prong of the qualified immunity test, whether the right was clearly established at the time, must be considered.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *James v. Dallas Hous. Auth.*, 526 Fed. Appx. 388, 392 (5th Cir. 2013) (*citing Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009)).  This inquiry focuses "on the specific circumstances of the incident" in question.  *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 383 n.1 (5th Cir. 2009) (*citing Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004)).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The court "will not deny immunity unless 'existing precedent . . . place[s] the statutory or constitutional question beyond debate.'" *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (*citing Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).  In setting forth the contours of the "clearly established" requirement, the Fifth Circuit recently stated that, in holding that a right allegedly violated was clearly established at the time of the alleged violation, a court must "be able to point to 'controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.'" *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (*citing Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (*en banc*)). The Supreme Court, however, does not require that "the very action in question has previously been held unlawful," but the unlawfulness must be apparent in light of pre-existing law. *Anderson*, 483 U.S. at 640 (citations omitted).

In *Williams v. Fears*, 179 U.S. 270 (1900), the Supreme Court stated that,

[u]ndoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of

free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution.

*Id.* at 274.  Nearly seventy years later, in striking down a Jacksonville, Florida, vagrancy ordinance that empowered police to arrest individuals for, among other things, "wandering around from place to place without any lawful purpose or object," *Papachristou v. City of Jacksonville*, 405 U.S. 156, 156 n.1 (1972) (*citing* former JACKSONVILLE, FLA. ORDINANCE CODE § 26-57), the Supreme Court stated that, were it to uphold such a statute, it would "result[] in a regime in which the poor and unpopular are permitted to 'stand on a public sidewalk . . . only at the whim of any police officer.'"  *Id.* at 170 (*citing Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965)).  In *Kennedy*, the Sixth Circuit stated that the Supreme Court's decisions in *Papachristou, Fears, Morales,* and *Kent* made it "apparent that [the plaintiff] had a clearly established right to remain on public property."  *Kennedy*, 595 F.3d at 337 (citations omitted).[33]

In *Cuellar v. Bernard*, No. SA-13-CV-91-XR, 2013 U.S. Dist. LEXIS 43145 (W.D. Tex. Mar. 27, 2013), the plaintiff, a former employee of the San Antonio Fire Department, "threatened to strangle and kill employees in the purchasing office because his requests had not yet been processed."  *Id.* at *1-2.  After exhibiting other, similar behavior, and tendering his resignation, he began requesting emails from his former coworkers' email accounts, credit card records, and other information.  *Id.* at *2.  In response, and pursuant to a state statute then in effect, the police chief and city attorney issued a notice of criminal trespass to the plaintiff banning him from city-owned property.  *Id.* at *3 n.1.  The court, finding for the plaintiff, noted that "individuals have a liberty interest in being in a public place of their choice."  *Id.* at *12. *See also Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) (citation omitted)

---

[33] The court went on to state that, "Any competent government official, particularly a police officer, should have realized that he cannot deprive a person, who has not committed a crime or violated some regulation, nor was likely to do so, of access to public grounds without due process of law." *Kennedy*, 595 F.3d at 337.

16

(recognizing a citizen's "constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally"). While the defendants in *Cuellar* argued that Cuellar posed a threat to the safety of others, the court noted that the defendants therein failed to "tender any persuasive evidence that Cuellar pose[d] any physical threat." *Cuellar*, 2013 U.S. Dist. LEXIS 43145, at *14-15. A similar statement could be made with regard to the instant case, where 1) the plaintiff was not arrested; 2) the plaintiff was not charged; 3) the plaintiff was not questioned by officers at the time the no trespass warning was issued; 4) the plaintiff was not searched during the stop of his vehicle; and 5) where it was allegedly determined by the district attorney that "there was insufficient evidence to pursue any charges against [the plaintiff]."[34]

Given the clear precedents of the Supreme Court, the Sixth Circuit, the Eleventh Circuit, other district courts in this circuit, the decisions of the state courts of Louisiana and Texas, the questionable application of Louisiana Revised Statute § 14:63.3, as well as the other options available to the officers at the time, the court is convinced that a police officer's constitutional inability to summarily ban an individual from public property for a prolonged and indeterminate period of time constituted clearly established law at the time of the alleged events herein. Accordingly,

**IT IS ORDERED** that the defendants' Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] as to the plaintiff's procedural due process claims be and hereby is **DENIED**.

### SUBSTANTIVE DUE PROCESS CLAIMS

"Substantive due process 'bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *Hamilton v. Foti*, 372 Fed. Appx.

---

[34] *See* Pet. [Doc. 1-2], at 5; Aff. of Lewis Coats [Doc. 23-3], at ¶ 13.

480, 485 (5th Cir. 2010) (*citing Zinermon*, 494 U.S. at 125).  The Supreme Court has repeatedly held that "the touchstone of due process is protection of the individual against arbitrary action of government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (*quoting Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).  A plaintiff seeking to recover for a substantive due process violation must show "(1) that he was deprived of a life, liberty, or property interest (2) in an arbitrary and capricious manner." *Saucedo-Falls v. Kunkle*, 299 Fed. Appx. 315, 319 (5th Cir. 2008) (*citing Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993)).  "In the context of law enforcement, the requisite conduct proscribed by the substantive due process clause has been described as that which 'shocks the conscience' when the conduct is 'brutal and offensive to human dignity' and is among the 'most egregious official conduct.'" *Vicknair v. La. Dep't of Wildlife & Fisheries*, No. 6:11-0184, 2013 U.S. Dist. LEXIS 39000, at *45 (W.D. La. Jan. 28, 2013) (citations omitted).

Accepting all of the plaintiff's allegations as true, the police officers in question appear to have been attempting to handle what they likely reasonably believed was a threat to public safety.  Even if the police were acting on erroneous intelligence, or if, for instance, the credit union employee manufactured the plaintiff's allegedly threatening statements, that does not make the police's conduct any less reasonable under the circumstances.  The police officers here communicated with the plaintiff several times after the issuance of the no trespass warning.  They documented their communications via several letters,[35] and they also lifted the no trespass warning voluntarily, prior to the plaintiff's filing of the instant suit.  While procedural safeguards are necessary, as already discussed, in order to prevent the improper use of governmental authority to harass or silence individual members of the community with whom those in power

---

[35] *See, e.g.*, Letter from Lewis Coats to C.J. Vincent, Oct. 16, 2012 [Doc. 1-2], at 11.

may disagree, the constitutional violations herein are categorically insufficient to rise to the level of a substantive due process violation.

While it would be a mistake on the part of the defendants to misconstrue the dismissal of the plaintiff's substantive due process claims as an endorsement of the extended extrajudicial exclusion of American citizens from public property by the police, "in order to state a viable substantive due process claim the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence." *McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002) (citation omitted).  This, the plaintiff has failed to do.  As a result, the plaintiff has not set forth a cognizable constitutional violation of his substantive due process rights.  Accordingly,

**IT IS ORDERED** that the defendants' Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] as to the plaintiff's substantive due process claims be and hereby is **GRANTED**.

### FIRST AMENDMENT CLAIMS

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. CONST. amend. I.  The First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *S.E.I.U., Local 5 v. City of Houston*, 595 F.3d 588, 595 (5th Cir. 2010) (citation omitted).  The plaintiff here has alleged that he has been "denied his freedom of speech, freedom of association[,]"[36] and the right to petition the government for redress of grievances.[37]

The Supreme Court of the United States

long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks, "which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of

---

[36] Pet. [Doc. 1-2], at 7.
[37] Am. Compl. [Doc. 18], at ¶¶ 19-20.

assembly, communicating thoughts between citizens, and discussing public questions.'"

*Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009) (*citing Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (additional citation omitted)). Accordingly, governmental entities, including law enforcement officers, "are strictly limited in their ability to regulate private speech in such 'traditional public fora.'" *Id.* (*citing Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

"[T]he First Amendment protects the right to speak in a public forum, and exclusions of *individuals* from a public forum cannot be based on the content of the individuals' speech alone." *King v. Haas*, No. C2-00-1411, 2002 U.S. Dist. LEXIS 28731, at *11 (S.D. Ohio Sept. 4, 2002) (*citing Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)) (emphasis added). However, a municipality is empowered to regulate expressive conduct in a public forum "to protect public health, safety, or welfare." *S.E.I.U., Local 5*, 595 F.3d at 596 (*citing Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 509-10 (5th Cir. 1981)).

The plaintiff alleges that he was specifically denied access to "'city hall,' 'old city hall,' 'city council chambers/building,' 'city of sulphur [sic] city council meetings,' city of sulphur [sic] police station,' 'city of sulphur court house,' 'city of sulphur [sic] business center across from the new city hall,' 'West Calcasieu business center,' and 'ward 4 marshal's office.'"[38] In assessing whether an individual's rights have been violated under the Free Speech Clause, it must first be determined which type of forum the regulation in question concerned, as the forum classification informs the appropriate standard to be applied. *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757 (5th Cir. 2010) (*citing Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001)).

---

[38] Pet. [Doc. 1-2], at 8.

There are three recognized types of forums: (1) traditional and designated public forums; (2) limited public forums; and (3) nonpublic forums. *Id.* at 757-58 (citations omitted). "Traditional public forums include sidewalks, streets, and parks that the public since time immemorial has used for assembly and general communication." *Id.* at 758 (*citing Haque v. Comm. For Indus. Org.*, 307 U.S. 496, 515 (1939)). For a regulation on speech in a traditional public forum to pass constitutional muster, it must be narrowly tailored to serve a compelling governmental purpose. *Id.* (*citing Chiu*, 260 F.3d at 344-45). Limited public forums are those which are reserved "for public expression of particular kinds or by particular groups." *Id.* (citations omitted). Regulation of limited public forums is permissible provided that it "(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum." *Id.* (citation omitted).

The defendants have not briefed the issue of qualified immunity as it pertains to the plaintiff's free speech claims.[39] It should be noted that this oversight was perhaps easy to make, given that the plaintiff's somewhat lengthy *pro se* petition only briefly mentions the violation of his free speech rights,[40] as well as the fact that the plaintiff's amended complaint simply "affirms and reiterates" the allegations contained in his original petition,[41] but does not otherwise expound on the speech claims asserted therein. As a result, there has been no argument offered as to the types of forums from which the plaintiff was excluded,[42] nor has there been any argument offered as to whether such exclusions violated clearly established law for the purpose of

---

[39] Memo. in Supp. [Doc. 23-1], at 26-28 (addressing the plaintiff's other First Amendment claims).
[40] Pet. [Doc. 1-2], at 7.
[41] Am. Compl. [Doc. 18], at ¶ 3.
[42] *See, e.g., Mnyofu v. Bd. of Educ. of Rich Township High Sch. Dist. 227*, 832 F. Supp. 2d 940, 943-48 (N.D. Ill. 2011) (finding that a school board meeting was a designated public forum and that the defendants were not entitled to qualified immunity as to the plaintiff's free speech claims after his having been banned from meetings of the school board). *See also Cuellar v. Bernard*, No. SA-13-CV-91-XR, 2013 U.S. Dist. LEXIS 43145, at *7-10 (W.D. Tex. Mar. 27, 2013) (finding that a ban similar to the one at issue herein did not comport with the First Amendment because it lacked the requisite narrow tailoring).

establishing qualified immunity.  As such, in the interest of providing the defendants with every opportunity to present arguments in their defense, the court is disinclined to rule on the defendants' Motion [Doc. 23] as to the plaintiff's free speech claims at this time.  Also, due to the interconnectivity of the free speech claims to the plaintiff's other claims asserted under the First Amendment,[43] the court will reserve judgment as to all First Amendment claims herein until the parties have had an opportunity to complete additional briefing.  Accordingly,

**IT IS ORDERED** that consideration of the defendants' Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] as to the plaintiff's claims under the First Amendment be and hereby is **STAYED** for a period of twenty-one (21) days from the date of the filing of this Memorandum Ruling into the record, during which time the defendants are hereby granted leave to submit additional briefing, not to exceed fifteen (15) pages in length, addressing the issue of qualified immunity as it pertains to the plaintiff's claims under the First Amendment, should they so choose.  The plaintiff will thereafter have fourteen (14) days from the filing of said additional briefing to file a response, addressing only his First Amendment claims, not to exceed fifteen (15) pages.

### EQUAL PROTECTION CLAIMS

The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  This is "essentially a direction that all persons similarly situated should be treated alike."  *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 212 (5th Cir. 2009) (*citing Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993)) (internal quotations and additional citations omitted).  To plead such a claim, "a plaintiff

---

[43] *See, e.g., Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) (noting that the Supreme Court has long held "as implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.").

typically alleges that he 'received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'" *Id.* at 212-13 (*citing Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (additional citations omitted)).

> To state a claim under the Equal Protection Clause, a § 1983 plaintiff must either allege that (a) "a state actor intentionally discriminated against [him] because of membership in a protected class[,]" or (b) he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."

*Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 238 (5th Cir. 2012) (internal citations omitted).

The plaintiff has not argued that he is a member of a protected class.[44] Thus, the court shall assume that the plaintiff asserts herein that he has been treated differently from similarly situated persons without a rational basis for the difference in treatment. The plaintiff offers no argument or evidence in support of this allegation. He offers nothing to indicate that others in similar scenarios were treated differently by local law enforcement. Furthermore, the plaintiff acknowledges that the officers in question were likely operating under the belief that he was in possession of a firearm and had made threats against public officials.[45] Under the circumstances, the defendants were not without a rational basis for any differential treatment of the plaintiff. The court thus finds that the plaintiff's rights under the Equal Protection Clause were not violated, and as such the defendants are entitled to qualified immunity as to this claim. Accordingly,

**IT IS ORDERED** that the defendants' Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] as to the plaintiff's equal protection claims be and hereby is **GRANTED**.

---

[44] *See* Memo. in Opp. [Doc. 25], at 49-50.
[45] *See* Pet. [Doc. 1-2], at 5.

## FOURTH AMENDMENT CLAIMS

The plaintiff has also asserted a violation of his Fourth Amendment right against wrongful search and seizure.[46] The Fourth Amendment guards individuals against unreasonable searches and seizures by the state. *See* U.S. CONST. amend. IV. "Traffic stops are considered seizures within the meaning of the Fourth Amendment." *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (*citing United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) (additional citation omitted)). In assessing the reasonableness of a traffic stop, courts consider (1) whether the officer's actions were justified at their inception, and (2) whether the scope of the officer's actions was "reasonably related . . . to the circumstances that justified the stop." *Id.* (*citing United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (*en banc*) (*citing Terry v. Ohio*, 392 U.S. 1, 19-20 (1968))).

An officer must possess "an objectively reasonable suspicion that some sort of illegal activity . . . occurred, or is about to occur, before stopping the vehicle" in order for the traffic stop to be justified at its inception. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citation omitted). Reasonable suspicion is something less than probable cause, but something more than an officer's "hunch," that requires, when assessing the totality of the circumstances, a "'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (citations omitted). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[s] the . . . seizure." *Id.* (*citing United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002)).

"A *Terry* stop is a brief investigative stop or detention, *made for the purpose of verifying or dispelling a law enforcement officer's suspicion of criminal activity.*" *United States v.*

---

[46] Am. Compl. [Doc. 18], at ¶ 5.

*McQuagge*, 787 F. Supp. 637, 644 (E.D. Tex. 1991) (*citing United States v. Sharpe*, 470 U.S. 675, 686 (1985); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)) (emphasis added). Here, however, it does not appear that the officers stopped the plaintiff for investigative purposes at all, although that certainly would have been reasonable given that the officers were supposedly operating under the impression that the plaintiff had just made death threats against several public officials.

The plaintiff alleges that Officer Gremillion informed him at the time of the stop that the plaintiff was not being detained for any traffic violations or criminal wrongdoing, but rather was being stopped so that the officers could inform the plaintiff of the "No Trespass Order" that was being issued against him.[47] Neither the plaintiff's person nor vehicle were searched, nor was he detained longer than was necessary in order for the officers to inform him of the purpose for the stop and to relay information regarding the trespass warning. The defendants' Motion [Doc. 23] likewise characterizes the stop as one conducted for the purpose of conveying information[48] in which the plaintiff was not questioned as to any matter, including the alleged threats.[49] Thus, it appears that, despite the fact that reasonable suspicion could be established relatively easily under these facts, the defendants' primary argument asserts that this was *not* a *Terry* stop, but rather an informational stop. The court agrees.

It is well-established that the Fourth Amendment permits law enforcement officers to approach individuals in public places in order to ask questions and seek out the voluntary cooperation of the public in the investigation of criminal activities. *See Ill. v. Lidster*, 540 U.S. 419, 425 (2004) (*citing Fla. v. Royer*, 460 U.S. 491, 497 (1983)). However, the application of this principle to traveling motorists is complicated by the fact that traffic stops necessarily

---

[47] Pet. [Doc. 1-2], at 5.
[48] Memo. in Supp. [Doc. 23-1], at 23.
[49] *See* Statement of Undisputed Material Facts [Doc. 23-2], at 2.

constitute a "seizure" for Fourth Amendment purposes, whereas a verbal request to stop and respond to an officer's request for information on a public street generally does not. *Id.* (*citing City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000)).

In *Illinois v. Lidster*, the Supreme Court found that the practice of conducting investigatory traffic stops of motorists for the purpose of gathering information regarding a recent homicide was not presumptively unconstitutional. *Id.* at 426-28. Rather, "in judging reasonableness," courts should consider "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 427 (*citing Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450-55 (1990) (additional citation omitted)).

The defendants rely on *Lidster* for the proposition that police may also conduct traffic stops for the purpose of *conveying* information as a matter of course.[50] The defendants' support for this proposition, however, is relatively weak, and they are not able to point to any Supreme Court or Fifth Circuit case law which supports their position.[51]

In *United States v. Faulkner*, 450 F.3d 466 (9th Cir. 2006), a case relied on by the defendants,[52] the Ninth Circuit Court of Appeals held that a checkpoint on federal land erected for the purpose of informing motorists of new regulations regarding the use and enjoyment of those public lands did not violate the Fourth Amendment. *Id.* at 468-69, 474. However, the court therein noted that the primary purpose of checkpoint was not to "advance 'the general interest in crime control,'" thus sidestepping the *per se* invalidity of such stops under the

---

[50] Memo. in Supp. [Doc. 23-1], at 23.
[51] *Id.* at 23-24.
[52] Memo. in Supp. [Doc. 23-1], at 23.

Supreme Court's holding in *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000)).[53]  The court

also noted the fact that "the checkpoint stop is inherently of a less frightful nature than an

ordinary seizure, such as a roving-patrol stop." *Id.* at 473 (citation omitted).

 *Faulkner* has no application to the instant facts.  The plaintiff was not detained as part of

a mass—albeit, brief—detention of motorists as occurs in a checkpoint, nor was he detained for

investigative purposes, as he was immediately informed of upon being pulled over and as the

defendants herein affirm; thus, *Lidster* is also inapplicable.  Likewise, as previously noted, *Terry*

stops are conducted for the purpose of investigating criminal activity, yet no investigation was

contemplated at the stop's inception.  The plaintiff was pulled over for the sole and singular

purpose of delivering a no trespass warning to him.  The limited case law permitting traffic stops

for the sole purpose of transmitting information, *see, e.g., Lidster*, 540 U.S. 419, is

distinguishable from the facts herein because those cases all address circumstances wherein law

enforcement officers are *seeking* information rather than disseminating it.  Were the court to

approve of a rule wherein law enforcement officers were free to conduct a traffic stop of any

individual with whom an officer has something to say, the Fourth Amendment protections

presently available to motorists would be immediately and greatly diminished.  Thus, the

plaintiff's Fourth Amendment right to be free from unreasonable seizure was violated in the

instant case.

 Nevertheless, it is difficult to say that this was clearly established law at the time.  The

plaintiff has failed to cite either controlling precedent on point, or a consensus of persuasive

authority that would support his position.  Given the Supreme Court's opinion in *Lidster*, and the

fluidity and complexity of the case law addressing the constitutionality of traffic stops for

---

[53] *See Edmond*, 531 U.S. at 44 (where the Supreme Court "decline[d] to suspend the usual requirement of
individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of
investigating crimes").

informational purposes in the absence of probable cause or reasonable suspicion, *see, e.g., id.; Edmond*, 531 U.S. 32; *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444 (1990), the ease with which the officers in question could have mistaken the stop here for a proper *Terry* stop given their beliefs as to the plaintiff's alleged threatening statements, despite the lack of any true investigative motive, and also considering the lack of case law directly on point, it cannot be said that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *James v. Dallas Hous. Auth.*, 526 Fed. Appx. 388, 392 (5th Cir. 2013) (*citing Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009)). As the court "will not deny immunity unless 'existing precedent . . . place[s] the statutory or constitutional question beyond debate,'" *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (*citing Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)), a grant of qualified immunity as to the Fourth Amendment claim is appropriate. Accordingly,

**IT IS ORDERED** that the defendants' Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] as to the plaintiff's claims for unlawful seizure in violation of the Fourth Amendment be and hereby is **GRANTED**.

## RIGHT TO TRAVEL CLAIMS

The plaintiff next alleges a violation of his right to travel, as the no trespass warning "burdened [his] movement within the City of Sulphur."[54] The Supreme Court has repeatedly reaffirmed that the "'constitutional right to travel from one State to another' is firmly embedded in [its] jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (*citing United States v. Guest*, 383 U.S. 745, 757 (1966)). This right has its basis in the Privileges and Immunities Clause of Article IV of the United States Constitution. *See id.* at 501-02 (*citing* U.S. CONST. art. IV, § 2).

---

[54] Am. Compl. [Doc. 18], at ¶ 14.

However, the Supreme Court has yet to recognize a corresponding right to intrastate travel under the Privileges and Immunities Clause. *See Dickerson v. City of Gretna*, No. 05-6667, 2007 U.S. Dist. LEXIS 29460, at *5 (E.D. La. Mar. 30, 2007) (*citing Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250 (1974) (additional citations omitted). Furthermore, in *Wright v. City of Jackson*, 506 F. 2d 900 (5th Cir. 1975), the Fifth Circuit refused to identify such a right. *See id.* at 902. *See also Alexander v. City of Gretna*, No. 06-5404, 2008 U.S. Dist. LEXIS 109090, at *7-8 (E.D. La. Dec. 3, 2008) (*citing Wright*, 506 F.2d 900) (granting the defendants' motion for summary judgment as to the plaintiff's claims for violations of the plaintiff's rights to intrastate travel, based on Fifth Circuit precedent, where the plaintiffs were prevented from crossing the Crescent City Connection bridge on foot in the wake of Hurricane Katrina).

The plaintiff herein has alleged a violation of his right to travel. However, there is no allegation that his right to interstate travel was impeded, as is required to set forth a constitutional violation of one's right to travel. Furthermore, the plaintiff was informed by the police at the time the warning was issued that "public thoroughfares and right-of-ways were not included in the no trespass order."[55]  While the issuance of a verbal warning on scene that differs in scope from a simultaneously issued written warning carries with it its own set of procedural problems, given these facts, the plaintiff has failed to show a constitutional violation of his right to travel occurred. Accordingly,

**IT IS ORDERED** that the defendants' Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] as to the plaintiff's claims for violations of his right to travel be and hereby is **GRANTED.**

## MUNICIPAL LIABILITY

---

[55] Pet. [Doc. 1-2], at 5.

29

The plaintiff has also sued the City of Sulphur.[56]  Municipalities may be held liable under 42 U.S.C. § 1983 for "their *own* illegal acts."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (*quoting Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (additional citation omitted)) (emphasis in original).  They may not, however, be held liable under a theory of *respondeat superior* for the actions of their employees.  *Id.* (citations omitted).  Thus, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  *Id.* (*citing Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)).

"[M]unicipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom."  *Id.* at 167 (*quoting Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citation omitted)).  The Fifth Circuit has "defined an official policy for purposes of § 1983 liability as '[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority.'"  *Okon v. Harris Cnty. Hosp. Dist.*, 426 Fed. Appx. 312, 316 (5th Cir. 2011) (*citing Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*) (*per curiam*)).  "'[P]roof that a municipality's . . . authorized decision maker has intentionally deprived a plaintiff of a federally protected right necessarily establishes' the municipality's culpability and causation."  *Id.* at 317 (*citing Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)).

---

[56] Pet. [Doc. 1-2], at ¶ 9.

The defendants have argued that the claims against the City of Sulphur fail first because there was no underlying constitutional violation.[57] However, the previous discussion regarding the violation of the plaintiff's right to procedural due process disposes of this argument.

The defendants' Motion [Doc. 23] addresses the matter of municipal liability primarily from the standpoint that the City may not be held liable under a "failure to train" theory.[58] The Supreme Court in *Connick* stated that an action which deprives an individual of his constitutional rights must be done pursuant to an "official municipal policy" in order to be actionable under § 1983. *Id.* at 1359. The Court further stated that such policies include the acts of its policymaking officials. *Id.* Then, it continued by stating that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* It is in *this* context that the "deliberate indifference" standard comes into play.[59]

Here, however, it appears that the constitutional violation alleged was done pursuant to the decision of a policy-making official—namely, Chief Coats. Several undisputed facts support this conclusion. As to whether Chief Coats is a policymaking official, other courts have stated that the "Chief of Police is the final policy maker with regard to the day-to-day supervision of the police force and the enforcement of state laws and municipal ordinances." *World Wide St. Preachers' Fellowship v. Town of Columbia*, No. 05-513, 2008 U.S. Dist. LEXIS 26929, at *24 (W.D. La. Apr. 3, 2008) (*citing* LA. REV. STAT. ANN. § 33:423; *St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)).

---

[57] Memo. in Supp. [Doc. 23-1], at 31.
[58] *See* Memo. in Supp. [Doc. 23-1], at 29-32.
[59] *See Connick*, 131 S. Ct. at 1359 (citation omitted) (stating that "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'").

Several facts also support the finding that the police chief's decisions herein, as policymaker, led to the deprivation of the plaintiff's right to procedural due process. First, it is noteworthy that the Official Notification of Trespass Warning [Doc. 23-4] that was issued to the plaintiff was on a pre-printed form, in which an officer need only fill in the blanks, supporting the inference that warnings of this type are issued with regularity. This is not necessarily dispositive, as there are, as previously noted, many legitimate conceivable implementations of Louisiana Revised Statute § 14:63.3 which would not amount to violations of procedural due process. However, the Affidavit of Lewis Coats [Doc. 23-3] states that Officer Gremillion informed Chief Coats on August 9, 2012 that he had issued the plaintiff a no trespass warning that banned him from all city property for an indeterminate period of time.[60] Chief Coats took no action to lift or narrow the order at that time. On October 4, 2012, in response to the plaintiff's letters, Chief Coats wrote to the plaintiff "and explained to him that he was issued the trespass warning due to an active investigation . . . into verbal threats he had made against City of Sulphur Officials."[61] It was only after the District Attorney informed Chief Coats that "there was insufficient evidence to pursue any charges against Mr. Vincent," and after obtaining Mayor Duncan's approval, that the no trespass order was lifted.[62] As the no trespass warning was issued pursuant to the decision of a policy-making official, the claims against the municipality need not proceed under a failure to train theory. The Fifth Circuit has stated that "[a] pattern of conduct is necessary only where the municipal actors are *not* policymakers. Alternatively, it may be shown that a *final policymaker* took a single unconstitutional action." *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) (citation omitted). For all of the foregoing reasons, a

---

[60] Aff. of Lewis Coats [Doc. 23-3], at ¶ 3.
[61] Aff. of Lewis Coats [Doc. 23-3], at ¶ 8.
[62] Aff. of Lewis Coats [Doc. 23-3], at ¶¶ 13-14.

grant of summary judgment to the defendants on the issue of municipal liability is not warranted at this time.  Accordingly,

      **IT IS ORDERED** that the defendants' Motion for Summary Judgment Based on Qualified Immunity [Doc. 23] as to the plaintiff's claims based on municipal liability under 42 U.S.C. § 1983 be and hereby is **DENIED**.

Lake Charles, Louisiana, this *14* day of _____ *May* _____ , 2014.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE